## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

STEVEN JOHN RIPP, Individually and as
Personal Representative on Behalf of the
Estate of L.J.R., a Minor Child Decedent,

            Plaintiff,

v.                                            CASE NO.:

BP EXPLORATION & PRODUCTION,
      INC., a Delaware Corporation,
BP AMERICA PRODUCTION CO.,
      a Delaware Corporation,
TRANSOCEAN HOLDINGS, LLC.,
      a Delaware Corporation,
TRANSOCEAN DEEPWATER, INC.,
      a Delaware Corporation,
TRANSOCEAN OFFSHORE
DEEPWATER DRILLING, INC.,
      a Delaware Corporation,
HALLIBURTON ENERGY SERVICES,
      INC.,  a Delaware Corporation,

            Defendants.
_____/

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, STEVEN JOHN RIPP, Individually on his own Behalf as a Parent, as Personal

Representative on Behalf of the Estate of L.J.R., a Minor Child Decedent ("Plaintiff"), by and

through undersigned counsel, hereby bring this action against BP EXPLORATION &

PRODUCTION, INC. ("BP Exploration"), BP AMERICA PRODUCTION COMPANY ("BP

America"), TRANSOCEAN HOLDINGS, LLC ("Transocean Holdings"), TRANSOCEAN

DEEPWATER, INC. ("Transocean Deepwater"), TRANSOCEAN OFFSHORE DEEPWATER

DRILLING, INC. ("Transocean Offshore"), and HALLIBURTON ENERGY SERVICES, INC. ("Halliburton") (collectively "Defendants"), stating as follows:

## INTRODUCTION OF PARTIES

1.      This is an action arising out of injuries, endured by L.J.R., a Minor ("Child Plaintiff") during his life, subsequently causing the wrongful death of L.J.R., a Minor Child Decedent ("Minor Child Decedent"), resulting from exposure in the womb and as an infant to oil, other hydrocarbons, dispersants, pollutants, and other Toxic Substances due to the *Deepwater Horizon* Oil Spill, which occurred on or about April 20, 2010 ("Oil Spill" or "BP Oil Spill").

2.      At all times relevant to this action, Plaintiff STEVEN JOHN RIPP ("Parent of Minor Child Decedent" or "Parent of Child Plaintiff") is an individual residing in Mobile County, Alabama, and is *sui juris*.

3.      At all times relevant to this action, Child Plaintiff was a citizen and resident of Fairhope, Alabama who passed away on March 15, 2020 – just approximately two months after his ninth (9th) birthday.

4.      Subsequently, Parent of Child Plaintiff is appointed as a personal representative of the Estate of Minor Child Decedent.

### *BP Defendants*

5.      Defendants BP EXPLORATION & PRODUCTION, INC. ("BP Exploration"), and BP AMERICA PRODUCTION COMPANY ("BP America") (collectively "BP Defendants") are Delaware corporations with its principal place(s) of business in Houston, Texas.

6.      BP Exploration was a leaseholder and performed oil exploration, drilling, and production-related operations, including the Mississippi Canyon Block 252 in the Gulf of Mexico ("Macondo Well" or "Well") where the Oil Spill originated.

7.      The United States Coast Guard designated BP Exploration as a "Responsible Party" of the Oil Spill.[1]

8.      At all times relevant to this action, BP Exploration purposely availed itself of this Court's personal jurisdiction by performing various acts related to the Oil Spill including:

    i.   Managing Clean-Up and/or Response Activities in and/or around the waters, shores, coastlines, and air of Alabama, Louisiana, Mississippi, Florida, and Texas (collectively "Gulf States");

    ii.  Pumping crude oil during the Oil Spill, which polluted the coasts of the Gulf States and surrounding environment(s);

    iii. Directing Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States;

    iv.  Participating with Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States; and

    v.   Engaging in commerce by purchasing, distributing, and supplying goods and services, including petroleum products, dispersants, as well as other supplies and services for various Clean-Up Response Activities.

    vi.  Doing business in Alabama.

9.      BP America was a party to the drilling contract with Transocean Holdings, LLC ("Transocean Holdings") for the drilling of the Macondo Well ("Well").

10.     The United States Coast Guard designated BP America as a "Responsible Party" of the Oil Spill.[2]

---

[1] *See* Case No.: 2:10-md-02179-CJB-SS, Rec. Doc. 1805-1.
[2] *Id.*

11.     At all times relevant to this action, BP America purposely availed itself of this Court's personal jurisdiction by performing various acts related to the Oil Spill including:

     i.   Managing Clean-Up and/or Response Activities in and/or around the waters, shores, coastlines, and air of Alabama, Louisiana, Mississippi, Florida, and Texas (collectively "Gulf States");

    ii.   Pumping crude oil during the Oil Spill, which polluted the coasts of the Gulf States and surrounding environment(s);

   iii.   Directing Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States;

   iv.   Participating with Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States;

    v.   Engaging in commerce by purchasing, distributing, and supplying goods and services to Gulf Residents, which included petroleum products, dispersants, as well as other supplies and services for various Response Activities; and

   vi.   Maintaining a presence in the Gulf States by doing business in Alabama.

### *Transocean Defendants*

12.     Defendants TRANSOCEAN HOLDINGS, LLC, TRANSOCEAN DEEPWATER, INC., and TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC. (collectively "Transocean Defendants" or "Transocean") are Delaware corporations with its principal place(s) of business in Houston, Texas.

13.     At all times relevant to this action, Transocean purposely availed itself of this Court's personal jurisdiction by performing various acts related to the Oil Spill, including:

     i.   Engaging in Clean-Up and/or Response Activities in or around the Gulf States;

ii.   Manning and guiding the Deepwater Horizon Rig ("DHR"), which exploded while pumping crude oil, resulting in the mass discharge and prolonged seepage of crude oil throughout the Gulf States;

iii.   Directing Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States;

iv.   Participating with Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States;

v.   Engaging in commerce by purchasing, distributing, and supplying goods and services to Gulf Residents, which included petroleum products, dispersants, as well as other supplies and services necessary for various Response Activities; and

vi.   Maintaining a presence in the Gulf States by doing business in Alabama.

### *Halliburton*

14.   Defendant HALLIBURTON ENERGY SERVICES, INC. ("Defendant Halliburton") is a Delaware corporation with its principal place of business in Houston, Texas.

15.   Sperry Drilling Services ("Sperry"), a former division of Defendant Halliburton, was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools. Sperry mudlogging personnel were jointly responsible for monitoring the Well, including mud pit fluid levels, mud flow in and out of the Well, mud gas levels, and pressure fluctuations.

16.   At all times relevant hereto, Halliburton Energy Services, Inc., and its Sperry division (collectively "Halliburton") purposely availed itself of this Court's personal jurisdiction by performing various acts related to the Oil Spill including:

   i.   Responsibility for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo Well;

   ii.   At and before the time of the blowout, engaging in Cementing Operations to isolate the hydrocarbon reservoirs and seal the bottom of the Well against the influx of hydrocarbons, such as gas and oil; and

   iii.   Maintaining a presence in the Gulf States by doing business in Alabama.

## JURISDICTION AND VENUE

17.    This action is in excess of $75,000, exclusive of interest, costs, and attorney's fees.

18.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists among the parties.

19.    Alternatively, this Court has subject matter jurisdiction pursuant to 43 U.S.C. § 1349(b)(1), which provides that "[t]he district courts of the United States shall have jurisdiction of cases and controversies arising out of . . . (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals . . . ."[3]

20.    Furthermore, in the event this Court lacks jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) and/or 43 U.S.C. § 1349(b)(1),  this Court has jurisdiction pursuant to 28 U.S.C. § 1333 and the Admiralty Extension Act, which extends admiralty and maritime jurisdiction of the United States to "[c]ases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."[4]

---

[3] *See* 43 U.S.C. § 1349(b)(1)
[4] *See* 46 U.S.C. § 30101(a)

21.     The causes of action in this Complaint arise under the general maritime laws of the United States and/or the laws of Alabama pursuant to U.S.C. § 1367(a).[5]

22.     The Southern District of Alabama is the proper venue, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to Plaintiff's claims occurred in the Southern District of Alabama, Plaintiff resides in the Southern District of Alabama, and Minor Child Decedent was exposed and passed away in the Southern District of Alabama.

23.     Additionally, as a part of Multidistrict Litigation ("MDL") 2179 *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, this case is filed in this district pursuant to this Court's Case Management Order for the B3 Bundle, dated August 20, 2021, providing "B3 actions filed directly on this Court shall be stayed pending a final determination on transfer by the Judicial Panel on [MDL]."[6]

24.     All conditions precedent to the institution of this action have been satisfied or otherwise excused.

## GENERAL FACTS

25.     All injuries and subsequent death detailed herein arise from the same transaction and/or occurrence relating to the BP Oil Spill, *Deepwater Horizon* Explosion, and subsequent Oil Spill related events and/or Response Activities.

26.     Plaintiff hereby reference, incorporate, and adopt all findings of fact detailed in *Findings of Fact and Conclusions of Law* ("Phase One Findings").[7]

---

[5] *See* 28 U.S.C. § 1367(a) – (e), Supplemental Jurisdiction.
[6] *See* Case No.: 1:21-cv-05000-KD-MU-C, Rec. Doc. 1
[7] *See* MDL Case No. 2179, Rec. Doc. 13355, 21 F.Supp.3d 657 (E.D. La. 2014).

27.     Specifically, in Phase One, the court ascertained the facts and considered evidence as to all Defendants' negligence and/or liability surrounding the blowout and explosion of the *Deepwater Horizon* on or about April 20, 2010.[8]

28.     After hearing the evidence, the court found that all Defendants were each liable under general maritime law for the blowout, explosion, and Oil Spill.[9]

29.     The court further found that BP Defendants acted with gross negligence and willful misconduct; Transocean Defendants' conduct was negligent; and Halliburton's conduct was negligent.  Fault was apportioned as follows:  BP Defendants found 67% liable, Transocean Defendants found 30% liable, and Halliburton found 3% liable.[10]

30.     There was a full and fair opportunity to litigate liability, liability was litigated, all Defendants were parties and/or in privity with a party, and resolution of those issues was necessary for the court to enter the Phase One Findings.

31.     On or about December 9, 1998, predecessors to all BP Defendants and all Transocean Defendants entered a contract for the construction, use, and operation of the *Deepwater Horizon*.

32.     BP Exploration leased the *Deepwater Horizon*, a vessel, to drill exploratory wells at the Macondo Well ("Well") prospect site.  BP's responsibilities, as operator and primary leaseholder, included assessing the geology of the site, engineering the Well design, obtaining regulatory approvals for Well operations, retaining the project's contractors, overseeing the project's contractors, and working on various aspects of the Well and Drilling Operations.

33.     BP America contracted with Transocean Holdings to drill the Macondo Well.

---

[8] *Id*.
[9] *Id*. at 746-47, 757.
[10] *Id*. at 757.

34.     Halliburton manufactured a nitrogen foam cement slurry mixture ("Cement Mixture") to provide cementing and mudlogging services for the *Deepwater Horizon*.

35.     The Oil Spill occurred with the blowout of the Macondo Well, which was drilled by the Deepwater Horizon Rig ("DHR") on the outer continental shelf in the Gulf of Mexico.

36.     The explosions and fire on board the DHR occurred on or about April 20, 2010.

### *Deepwater Horizon BP Oil Spill*

37.     On April 20, 2010, workers on the *Deepwater Horizon* Oil Rig lost control of the Macondo Well just after the final cementing work was completed. During the cementing work, an explosion occurred on the *Deepwater Horizon*, and it caught fire.

38.     The explosion and fire itself caused the deaths of eleven (11) people and at least seventeen (17) others were injured from the immediate April 20, 2010 incident alone.

39.     The explosion(s) and/or fire should have triggered the automatic function on the vessel's Blowout Preventer ("BOP"). The function failed, or the BOP failed to shut in the Well.

40.     The *Deepwater Horizon* was connected to the wellhead at the seafloor by an approximately 5,000-foot pipe called a "riser" and, as the vessel sank, it pulled the riser down with it – bending and breaking the pipe before finally tearing away from it completely.

41.     The riser, bent into a crooked shape underwater, extended approximately 1,500 feet above the seabed, and then buckled back down. Oil flowed out from the open end of the riser, and through two (2) breaks along its length.

42.     On or about April 22, 2010, the vessel sank to the ocean floor after burning for approximately two (2) days.

43.     Millions of gallons of oil discharged into the Gulf of Mexico over the next 87-days.

44.     Crude oil was discharged before the *Deepwater Horizon* platform sank on or about April 22, 2010. However, the rate of discharge increased even more once the *Deepwater Horizon* sank to the ocean floor.

45.     After the explosion and sinking of the *Deepwater Horizon*, BP Defendants attempted to downplay and/or conceal the severity the BP Oil Spill. Government investigators found that BP's initial leak-estimate of 1,000 barrels of oil per day was a mere fraction of its measured leakage of approximately 50,000 barrels per day.

46.     Moreover, BP Defendants did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the BP Oil Spill.

47.     On or about April 30, 2010, oil made landfall as the flow of oil continued unabated.

48.     On or about June 20, 2010, Congressman Edward Markey of Massachusetts released an internal BP document showing that BP's own analysis revealed the actual rate of oil leakage to be 4,200,000 gallons per day, and that the total oil leakage could reach 100,000 barrels.

49.     The BP Oil Spill created an oil slick with a range of thousands of miles, with thick voluminous plumes of oil in the deep waters within the Gulf of Mexico.  The Oil Spill caused these slicks and plumes to form.

50.     The oil infiltrated, and continues to infiltrate, the delicate wetlands and intertidal zones that protect the coasts of Louisiana, Mississippi, Alabama, Texas, and Florida.

51.     An estimated 200-million gallons of crude oil infiltrated sensitive coastland and intertidal ecosystems.

52.     On July 15, 2010, after multiple unsuccessful attempts, the Well was finally capped and by mid-September, it was sealed with cement.

53.     After the Oil Spill, the United States Coast Guard formally and/or informally designated, *inter alia*, BP Defendants and Transocean Defendants as "Responsible Parties" under the Oil Pollution Act ("OPA").

54.     Leaked crude oil contains many highly toxic and hazardous chemicals, which can damage nearly every system in the human body.

55.     In the wake of the disaster, and pursuant to its duties and responsibilities under the OPA, BP Defendants began implementing a Response and Containment Plan.

56.     The "BP Oil Spill" includes the events, actions, inactions, and omissions leading up to, during, and after the following:

> i.    The blowout of the Macondo Well, which was drilled on the Outer Continental Shelf in the Gulf of Mexico;
>
> ii.   The explosions and fire on board the DHR on or about April 20, 2010;
>
> iii.  The sinking of the DHR on or about April 22, 2010;
>
> iv.   The release of oil, other hydrocarbons, pollutants, and other toxic substances from the Macondo Well and/or the DHR and its appurtenances;
>
> v.    The efforts to contain the Macondo Well; and
>
> vi.   Response Activities performed by Clean-up Workers and Response Workers under the direction of Unified Command.

57.     BP Defendants were the operators of the Macondo Well under federal regulations of the Minerals Management Service ("MMS"). Therefore, BP Defendants were the lessee(s) designated as having control and/or management of operations.

58.     As operators and primary leaseholders, BP Defendants were responsible for, including, but not limited to – assessing the geology of the site, engineering the Well design,

obtaining regulatory approvals for Well Operations, retaining, and overseeing the project-contractors, and working on various aspects of the Well and drilling operations.

### *DWH Toxic Chemicals*

59.     For purposes of this action, crude oil, hydrocarbons, benzene, and/or products containing benzene, which are all associated with the Clean-Up Efforts from the Macondo Well and the *Deepwater Horizon* Explosion, are collectively known as "DWH Toxic Chemicals."

60.     After the disaster, BP Defendants began implementing a Disaster Response Plan to prevent oil from escaping the blown-out Well, manually contain the oil, and disperse oil in the water using chemical dispersants.

61.     BP Defendants' Response Plan included the use of chemical dispersants, specifically Corexit, to break down the oil into finely dispersed droplets.

62.     On or about April 23, 2010, immediately after the *Deepwater Horizon* disaster, BP began subsea and aerial application of chemical dispersants to the oil slicks and sheens on the surface of the Gulf of Mexico.

63.     On or about May 19, 2010, the United States Environmental Protection Agency ("EPA") Administrator directed BP Defendants, within 24-hours of issuance, to identify and use chemical dispersants that are less toxic than the Corexit dispersants.

64.     On May 20, 2010, BP Defendants objected to changing dispersants and notified the EPA that it would continue using Corexit.

65.     BP Defendants' use of Corexit skyrocketed in May of 2010.

66.     On May 22, 2010, BP Defendants used 45,000 gallons of Corexit.

67.     On May 23, 2010, BP Defendants used 70,000 gallons of Corexit.

68.    On May 26, 2010, the EPA directed BP Defendants to reduce overall use of Corexit by 75%.  This EPA directive also required BP Defendants to eliminate use of chemical dispersants on the surface, except in rare cases where an exemption is sought in writing from the United States Coast Guard Federal On-Scene Coordinator in charge of the Response Efforts.

69.    Since the May 26, 2010 EPA directive, BP Defendants sought more than forty (40) exemption requests to use chemical dispersants on the surface and subsea in the Gulf of Mexico.

70.    The dispersant-treated and raw crude oil carried significant public health risks because it contained highly toxic chemicals, which can damage various systems in the body.

71.    Specifically, crude oil contains benzene and other Volatile Organic Compounds ("VOCs") such as ethylbenzene, toluene, xylene, naphthalene, Polycyclic Aromatic Hydrocarbons ("PAHs"), diesel fumes, and heavy metals such as aluminum, cadmium, nickel, lead, and zinc.

72.    These compounds can cause severe harm to human and reproductive health.

73.    Chemicals such as benzene, PAHs, VOCs, and other chemicals in crude oil are toxic and move from the oil into the air.

74.    Once airborne, these chemicals and fugitive emissions, with pungent petroleum-like odors, can blow over the ocean for hundreds of miles, reaching communities far from the location of the Oil Spill.

75.    According to the Agency for Toxic Substances and Disease Registry, which is part of the United States Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain, and lethal central nervous system depression.

76.     A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system, and abnormal development of blood cells. Long term, low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping, memory loss, and cancer.

77.     As a result of the explosion of the DHR, DWH Toxic Chemicals and many highly toxic dispersants were released from the Macondo Well and reached the shores of the Gulf States.

### *Toxic Dispersants*

78.     Aside from DWH Toxic Chemicals, BP Defendants purchased highly noxious chemical dispersants from Nalco, a chemical manufacturer, and/or its subsidiaries and sprayed them as part of the Response Activities performed in the Clean-Up Efforts.  These dispersants manufactured by Nalco include Corexit EC9500A and Corexit EC9527A.

79.     Corexit products contain hazardous substances, harmful to human health, and dermal exposure, inhalation, and ingestion should be avoided.

80.     Corexit EC9500 is an eye and skin irritant and can irritate the respiratory tract if inhaled, for example, it can cause chemical pneumonia.

81.     Corexit EC9527A contains 2-butoxyethanol, ("EGBE").  Repeated or excessive exposure to EGBE can cause injury to red blood cells, the kidneys, and the liver.  EGBE can be carcinogenic to humans.  It is an eye, nose, and throat irritant that causes nausea, vomiting, diarrhea, and abdominal pain.  Exposure to EGBE can also cause headaches, dizziness, lightheadedness, and unconsciousness.

82.     These harmful dispersants, Corexit EC9500A and Corexit EC9527A, are hereinafter collectively referred to as "Toxic Dispersants."

83.     On or about April 23, 2010, BP Defendants and/or BP Defendants' agents began applying Toxic Dispersants to the oil on the surface of the Gulf of Mexico. BP Defendants sprayed Toxic Dispersants onto the ocean surface from aircrafts, which flew over areas with oil and dispensed chemicals from cargo holds, fountain type jets on the decks of boats, and smaller vessels onto the surface of the water. BP Defendants also injected Toxic Dispersants immediately below the surface of the water from vessels, deep below the surface of the ocean, and even sprayed by hand. BP Defendants sprayed these Toxic Dispersants throughout the day and night, exposing anyone near the coastal areas, despite warnings not to.

84.     According to the *BP Deepwater Horizon Gulf Study*, which was based on the health effects of Zone Residents and Clean-Up Workers around the BP Oil Spill, the toxic effects on the human body are 52-times more toxic when Corexit and crude oil are combined.

85.     The *BP Deepwater Horizon Gulf Study*, funded by BP Defendants themselves, showed how upstream petrochemical workers have experienced leukemia, multiple myeloma, melanoma, and esophageal adenocarcinoma.

86.     BP Defendants used dispersants known to cause, *inter alia*:  headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of Chronic Obstructive Pulmonary Disease ("COPD").

87.     BP Defendants and its contractors have used more than 1.8 million gallons of toxic dispersants in the Gulf of Mexico in connection with the Oil Spill.

### *Minor Child Decedent's Exposure*

88.     During approximately April 2010 through January of 2011, while in the womb, then as an infant and child, Child Plaintiff was exposed to oil, chemicals, dispersants, pollutants, PAHs, VOCs, other hydrocarbons, and other substances (collectively "Defendants' Substances") in and around Alabama.

89.     Specifically, Minor Child Decedent was exposed to Defendants' Substances while in the womb when Mother of Child Plaintiff would frequently swim while pregnant with him in the water at Orange Beach and the Gulf Shores in Alabama. Mother of Child Plaintiff would frequent the beach approximately four times per month for four hours per day.

90.     After the birth of Child Plaintiff on January 27, 2011, his Parents also brought him to the beach and in those waters approximately four (4) times a week from 2010 through 2011.

91.     Child Plaintiff was born with Gastroschisis, a medical condition which has been shown to have an association to PAH exposure among expectant mothers.

92.     When the Child Plaintiff was approximately three years of age, he was diagnosed with attention deficit hyperactivity disorder ("ADHD").

93.     In addition, the Child Plaintiff was diagnosed with Autism.

94.     At all relevant times, Plaintiff was completely unaware of Defendants' wrongful conduct, remaining uninformed of the dangers and hazards related to Child Plaintiff's exposure.

95.     Further, at the time of the Oil Spill and during the Response Activities, misleading information caused the belief that exposure to oil and/or dispersants was *safe*.

## CAUSES OF ACTION

### COUNT I – NEGLIGENCE
### (Against All Defendants)

96.     Plaintiff realleges and incorporate by reference the allegations contained in paragraphs 1 - 95.

97.     At all times relevant to this action, Defendants participated in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico.

98.     Defendants owed duties of ordinary and reasonable care to Plaintiff in connection with the Drilling Operations of the *Deepwater Horizon* and maintenance of the vessel, its appurtenances, and equipment.

99.     Defendants owed duties of ordinary and reasonable care to Plaintiff to guard against and/or prevent the risk of the Oil Spill and its subsequent Clean-Up and Response.

100.     Defendants owed a duty to warn Plaintiff of non-obvious dangers, such as chemical dispersants and Defendants' Substances infiltrating beaches, marine animals, drinking water, intercoastal waterways, tributaries, seafood, and other areas along the greater Gulf Coast.

101.     Defendants further owed duties to those who might foreseeably be harmed, including Plaintiff, and to exercise due care in the operation, maintenance, handling, design, implementation, and execution of the relief and recovery measures.

102.     At all times material to this action, Defendants breached duties of ordinary and reasonable care to Plaintiff in connection with the Drilling Operations of the *Deepwater Horizon* and maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to Plaintiff to guard against and/or prevent the risk of the Oil Spill.

103.     Additionally, Defendants breached a duty to Plaintiff, including persons who might foreseeably be harmed, to exercise due care in the planning, operation, maintenance, handling, design, implementation, and execution of the Oil Spill Relief and Recovery Measures.

104.    Defendants failed to warn and/or provide sufficient warnings to Plaintiff of the non-obvious dangers and heightened risks associated with the Oil Spill and subsequent Clean-Up, such as chemical dispersants and Defendants' Substances infiltrating beaches, seafood, drinking water, intercoastal waterways, tributaries, and/or other areas along the greater Gulf Coast.

105.    Furthermore, Defendants knew or should have known that:

    i.   Crude oil contains hazardous chemicals that are deleterious to human health and the environment;

    ii.   Toxic Dispersants used contain hazardous chemicals that are deleterious to human health and the environment;

    iii.   Individuals, such as Plaintiff, required information from Defendants to become aware of the non-obvious dangers of the harmful effects of crude oil and/or chemical dispersants and/or combination thereof;

    iv.   Individuals, such as Plaintiff, were misinformed about the need to stay away from the hazard infiltrating beaches, seafood, drinking water, intercoastal waterways, tributaries, and other areas along the greater Gulf Coast when in proximity to crude oil and/or chemical dispersants;

    v.   Individuals, such as Plaintiff, believed that profitable corporations such as Defendants would have invested resources in warning the public of the hazard if health and safety posed a risk at the time of the Oil Spill; and

    vi.   Failure to invest resources of the corporation(s) to properly inform families of the hazard, was necessary at the time of the Oil Spill due to conflicting messages at the governmental level from tourism concerns and other public interests separate from private entities and/or corporation(s).

106.    It is undisputed that the blowout and explosions on the *Deepwater Horizon*, its sinking, the resulting Oil Spill, and Response Activities were caused by the joint and concurrent negligence of all Defendants.

107.    On September 4, 2014, Judge Barbier of the Unites States District Court for the Eastern District of Louisiana issued *Findings of Facts and Conclusions of Law* holding that BP Defendants' conduct was reckless, Transocean Defendants' conduct was negligent, Halliburton's conduct was negligent, and that each were liable under general maritime law for the blowout, explosion, and subsequent Oil Spill from the *Deepwater Horizon Incident*.[11]

108.    Damages sustained by Plaintiff as a result of the Oil Spill are apportioned as follows as to liability:  BP Defendants 67%, Transocean Defendants 30%, and Halliburton 3%.

109.    In addition to the court's findings, Defendants breached duties by:

  i.  Failing to warn Plaintiff of the harmful effects of toxic and chemical dispersants, including benzene, PAHs, VOCs, and other hazardous substances coming into contact with Plaintiff;

  ii.  Failing to properly warn Plaintiff to avoid exposure to hazardous substances encountered in connection with the Oil Spill;

  iii.  Failing to maintain, monitor, and operate the *Deepwater Horizon* in a reasonably safe manner so as to avoid harm to foreseeable individuals, such as Plaintiff, harmed from reproductive and/or in-utero exposure, and/or infant exposure, and/or early childhood exposure;

  iv.  Failing to inspect the BOP to ensure it was not faulty and/or would not fail during use to avoid harm to foreseeable individuals, such as Plaintiff, harmed

---

[11] *See In re Oil Spill*, 21 F.Supp.3d 657, 757 (E.D. La. 2014).

from reproductive and/or in-utero exposure, and/or infant exposure, and/or early childhood exposure; and/or

v.  Failing to otherwise exercise reasonable care in the planning, operation, maintenance, handling, design, implementation, and/or execution of the Clean-Up and Response Activities with recovery measures to avoid harm to foreseeable individuals, such as Plaintiff.

110.   Plaintiff was exposed and came into contact with oil, other hydrocarbons, chemical dispersants, and/or other substances through the eyes, nose, mouth, skin, and/or airways via inhalation, ingestion, dermal, and direct contact.

111.   Child Plaintiff was exposed to chemical dispersants, oil, toxins, and/or other substances and suffered significant injuries, including Gastroschisis, ADHD, and Autism.  These conditions ultimately led to Minor Child Decedent's subsequent death, which were foreseeable, natural, and probable consequences of Defendants' negligence.

112.   As a direct and proximate cause of Defendants' negligence, Child Plaintiff suffered through several agonizing years of repeated surgeries, treatments, and medical care, traveled to back-and-forth for medical care, lost precious years of his childhood because of his condition, and fought for his life with bravery for years. After a long fight, Minor Child Decedent passed away at the age of nine (9) years old – just two months after his ninth (9th) Birthday.

113.   As a direct and proximate cause of Defendants' negligence, Child Plaintiff's Parents must live with an unimaginable and unthinkable loss for the rest of their lives.

WHEREFORE, Plaintiff hereby demand judgment against all Defendants as follows:

i.   Past medical and funeral expenses;

ii.   Past travel expenses for medical care and treatment;

iii.      Compensatory damages;

iv.      Loss of consortium;

v.      Loss of a son;

vi.      Emotional losses, pain, and suffering;

vii.      Loss of earnings of Decedent from the date of injury to date of death, less lost support of survivors excluding contributions in kind, with interest;

viii.      Loss of the prospective net accumulations of the Estate of L.J.R., a Minor Child Decedent;

ix.      Pain and suffering prior to death;

x.      Punitive damages;

xi.      Pre-judgment and post-judgment interest;

xii.      Any and all supplemental Alabama Wrongful Death statute (Ala. Code § 6-5 - 410) remedies available; and

xiii.      Any other relief this Court deems just and proper.

### COUNT II – GROSS NEGLIGENCE
### (Against BP Defendants)

114.     Plaintiff realleges and incorporate by reference the allegations contained in paragraphs 1 - 113.

115.     BP Defendants owed duties of ordinary and reasonable care to Plaintiff in connection with the Drilling Operations of the *Deepwater Horizon* and the maintenance of the vessel, its appurtenances, and equipment.

116.     BP Defendants also owed duties of ordinary and reasonable care to Plaintiff to guard against and/or prevent the risk of the Oil Spill.

117.    BP Defendants owed a duty to warn Plaintiff of non-obvious dangers, such as chemical dispersants and Defendants' Substances infiltrating beaches, seafood, drinking water, intercoastal waterways, tributaries, and/or other areas along the greater Gulf Coast.

118.    BP Defendants further owed duties to those who might foreseeably be harmed, including Plaintiff, to exercise due care in the planning, operation, maintenance, handling, design, implementation, and execution of the relief and recovery measures.

119.    Furthermore, BP Defendants knew or should have known that:

    i.   Crude oil contains hazardous chemicals that are deleterious to human health and the environment;

    ii.   The toxic and chemical dispersants used contain hazardous chemicals, which are deleterious to human health and the environment;

    iii.   Plaintiff expected a multi-billion-dollar corporation to make the public, consumers, and Parents aware of the non-obvious dangers of the harmful effects of crude oil and/or chemical dispersants;

    iv.   Failing to warn Plaintiff of the harmful effects caused by coming into contact with Defendants' Substances from Plaintiff's exposure to benzene, PAHs, VOCs, and other hazardous substances would result in harm;

    v.   Failing to properly warn Plaintiff to avoid exposure to hazardous substances encountered in connection with the Oil Spill was detrimental to human health;

    vi.   Failing to maintain, monitor, and operate the *Deepwater Horizon* in a reasonably safe manner so as to avoid harm to foreseeable individuals, such as Plaintiff, causing reproductive and/or in-utero exposure, and/or infant exposure, and/or early childhood exposure;

    vii.  Failing to inspect the BOP to ensure it was not faulty and/or would not fail during use would cause harm to foreseeable individuals, such as Plaintiff harmed from reproductive and/or in-utero exposure, and/or infant exposure, and/or early childhood exposure; and/or

    viii.  Failing to otherwise exercise reasonable care in the planning, operation, maintenance, handling, design, implementation, and/or execution of the Clean-Up and Response Activities with recovery measures was necessary to avoid harm to foreseeable individuals, such as Plaintiff.

120.   BP Defendants additionally focused primarily on profit and image while recklessly disregarding the health of the public, as well as the health and safety of the surrounding environment(s) while undertaking ultra-hazardous activities on the *Deepwater Horizon*.

121.   BP Defendants' conduct was reckless and/or willful and wanton, which completely disregarded the safety of children and families in the Gulf States, such as Plaintiff, by:

    i.  Performing a critical well pressure test using untrained, unqualified personnel, and ignoring and/or misinterpreting abnormal "red flag" pressure test results;

    ii.  Using a Well design with too few barriers to gas flow;

    iii.  Failing to use a sufficient number of centralizers to prevent channeling during the cement process;

    iv.  Failing to run a bottoms-up circulation of the drilling mud prior to beginning the cement job;

    v.  Failing to run a cement bond log to evaluate the integrity of the cement job;

    vi.  Failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the Well;

vii.   Using an untested, abnormally large volume of mixed spacer solutions to avoid properly disposing of the two-separate spacer substances as hazardous waste;

viii.   Grossly inadequate maintenance, and reckless and improper operation and use of the BOP appurtenant;

ix.   Failing to ensure containment of oil expeditiously and adequately, and within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout;

x.   Failing to ensure that adequate safeguards, protocols, procedures, and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled Oil Spill;

xi.   Failing to warn the public, such as Plaintiff, of Harmful effects of the DWH Toxic Chemicals and Toxic Dispersants;

xii.   Failing to warn the public, such as Plaintiff, of Harmful health effects from exposure to these substances;

xiii.   Failing to warn the public, such Plaintiff, of the need to use proper protective clothing and respirators when in close proximity to the areas affected by the BOil Spill; and/or

xiv.   Failing to warn the public, such as Plaintiff, of the need to remain away from the beaches despite conflicting information from sources separate from the corporation primarily responsible for the Oil Spill.

xv.   Failing to use reasonably safe dispersant chemicals in attempt to respond to the Oil Spill;

xvi.   Willfully using Corexit despite the EPA issuing directives for BP Defendants to use lesser toxic dispersants than Corexit; and/or

xvii.   Willfully failing to comply with and/or ignoring EPA directives to reduce the use of surface and subsurface dispersants.

122.   Plaintiff was exposed to and encountered oil, other hydrocarbons, chemical dispersants, and/or other substances through the eyes, nose, mouth, skin, and airways via dermal, ingestion, inhalation, and/or direct contact.

123.   BP Defendants' conduct was reckless and/or willful and wanton.

124.   BP Defendants knew or should have known that such reckless and/or willful and wanton conduct would foreseeably cause Child Plaintiff's injuries and subsequent death.

125.   As a direct and proximate cause of BP Defendants' reckless and/or willful and wanton acts, Plaintiff was exposed to Defendants' Substances, including chemical dispersants and/or other toxins and Child Plaintiff suffered significant injuries including Gastroschisis, ADHD, and Autism and subsequent death.

126.   These injuries Child Plaintiff endured, his subsequent death, and loss to his Parents, were foreseeable, natural, and probable consequences of BP Defendants' reckless and/or willful and wanton conduct, which led to the Oil Spill and subsequent Response Activities that exposed Child Plaintiff to harmful substances causing his terminal illness.

127.   As a direct and proximate result of BP Defendants' reckless and/or willful and wanton acts, Child Plaintiff passed away leaving behind his loving parents.

128.   As a direct and proximate result of BP Defendants' reckless and/or willful and wanton acts, Child Plaintiff's Parents will endure the lifelong pain of having buried a child.

WHEREFORE, Plaintiff hereby demand judgment against BP Defendants as follows:

i.   Past medical and/or funeral expenses;

    ii.    Loss of earnings from the date of injury to the date of death, less lost support of survivors excluding contributions in kind, with interest;

   iii.    Loss of the prospective net accumulations of the Estate of L.J.R., a Minor Child Decedent;

   iv.    Pain and suffering before death;

    v.    Pain and suffering leading to death;

   vi.    Loss of consortium;

  vii.    Loss of life;

 viii.    Loss of childhood;

   ix.    Loss of adulthood;

    x.    Emotional trauma from the death of a child;

   xi.    Fear of future illness as to his minor-siblings and Parents' living children;

  xii.    Fear of future illness and/or condition(s);

 xiii.    Punitive damages;

 xiv.    Pre-judgment and post-judgment interest;

  xv.    Any and all supplemental Alabama Wrongful Death statute (Ala. Code § 6-5-410) remedies available; and

 xvi.    Any other relief this Court deems just and proper.

### COUNT III – WRONGFUL DEATH ACTION
### FOR PECUNIARY AND NON-PECUNIARY DAMAGES
### UNDER GENERAL MARITIME LAW
### (Against all Defendants)

129.    Plaintiff realleges and incorporate by reference the allegations contained in paragraphs 1 – 128.

130.    This common law cause of action was brought under General Maritime Law of the United States, as supplemented by the Laws of the State of Alabama pursuant to 28 U.S.C. § 1367.

131.    BP Defendants' lack of adherence to the rights and safety of Plaintiff was outrageous, grossly negligent, willful, wanton, with reckless disregard and indifference.

132.    Minor Child Decedent was only nine (9) years old when he passed away after several years of fighting for his life, while enduring harsh pediatric treatment.

133.    Before his untimely passing, Child Plaintiff was the loving son of Plaintiff.

134.    As a further direct and proximate result of the outrageous conduct of BP Defendants, and Minor Child Decedent's death, his heirs and dependents have suffered great losses of a personal and pecuniary nature, including the love, affection, comfort, company, society, consortium, and the permanent loss of support due to Child Plaintiff's loss of future earning capacity and services, all to their non-pecuniary damage and pecuniary damages in an amount in excess of this Court's jurisdictional limits.

135.    As a direct and proximate result of the aforesaid acts and omissions of BP Defendants, Child Plaintiff suffered serious injuries personal and pecuniary in nature, including but not limited to great physical pain, suffering, distress, mental anguish, fear, impairment, disfigurement, loss of childhood, loss of normalcy, and discomfort prior to his passing.

136.    Minor Child Decedent's Estate is also entitled to damages for loss of life, including the loss of the value that Minor Child Decedent would have put on his own life, in addition to funeral expenses as well as other losses such as medical expenses and cost of travel for treatment.

137.    As a further direct and proximate result of BP Defendants' conduct, and Minor Child Decedent's ensuing death, his heirs and dependents have and will incur losses and memorial and funeral expenses in an amount to be determined at the time of trial.

138.    By virtue of the acts and omissions set forth in herein, BP Defendants conducted themselves in such an outrageous and grossly negligent manner as to justify punitive and/or exemplary damages under maritime law, to be determined pending bifurcation.

139.    BP Defendants' acts and omissions led to the Oil Spill and subsequent Response Activities, exposing Plaintiff to chemical dispersants and/or Toxic Substances, which resulted in Child Plaintiff's condition(s).

140.    BP Defendants acted with gross negligence, remaining recklessly indifferent to its own conduct causing harm(s) to human health, and in reckless disregard for the cost of putting profit and public image before the lives of children and families in the Gulf States.

141.    Thus, BP Defendants showed conscious, willful, and wanton disregard for the safety of others, including Minor Child Decedent, and are at fault for causing the death, injuries, and damages alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff hereby demands judgment against BP Defendants as follows:

  i.  Past physical pain and suffering, mental pain, anguish, and distress, loss of enjoyment of life, and impairment;

  ii.  Past medical expenses;

  iii.  Funeral and memorial expenses;

  iv.  Loss of earnings of the Decedent from the date of injury to the date of death, less lost support of survivors excluding contributions in kind, with interest;

  v.  Loss of the prospective net accumulations of the Estate of L.J.R., a Minor Child Decedent;

  vi.  Mental pain, anguish, distress, loss of enjoyment of life, and impairment;

vii.   Recovery of Child Plaintiff's damages resulting from his illness and death, including, but not limited to damages for loss of love, affection, consortium, society, companionship, care, guidance, monetary support;

viii.  Punitive and/or exemplary damages;

ix.   Pre-judgment and post-judgment interest;

x.    Attorney's fees and costs;

xi.   Any other relief this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands trial by jury on all issues so triable.

Dated: March 15, 2022

Respectfully Submitted,
**THE DOWNS LAW GROUP, P.A.**
3250 Mary Street, Suite 307
Coconut Grove, Florida 33133
Telephone: (305) 444-8226
Facsimile: (305) 444-6773

*/s/ C. David Durkee*
C. David Durkee, Esq.
Florida Bar No.: 998435
Email: ddurkee@downslawgroup.com

*/s/ Elsa De Lima*
Elsa De Lima, Esq.
Florida Bar No.: 1004953
Email: edelima@downslawgroup.com

***Attorneys for Plaintiff***

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been

served on Counsel registered to receive electronic service via electronically filing using the

CM/ECF System, which will send a notice of electronic filing through the Court's electronic filing

system, on this 15th of March, 2022.


*/s/ Elsa De Lima*
Elsa De Lima, Esq.